1  Dora V. Lane, Esq.
   Nevada State Bar No. 8424
2  dlane@hollandhart.com
   HOLLAND & HART LLP
3  5441 Kietzke Lane, Second Floor
   Reno, Nevada 89511
4  Telephone: (775) 327-3000
   Facsimile:  (775) 786-6179

5

6  *Attorneys for Defendant*
   *Barrick Goldstrike Mines, Inc.*

7

8              **THE UNITED STATES DISTRICT COURT**

9              **FOR THE DISTRICT OF NEVADA**

10

11  LESTER DECKER,

12                        Plaintiff,                    CASE NO.:  3:12-cv-00287- LRH -WGC

13  v.

14  BARRICK GOLDSTRIKE MINES, INC., a                   **DEFENDANT'S MOTION FOR**
    foreign corporation,                                **SUMMARY JUDGMENT** [REDACTED]
15

16                        Defendant.

17          Pursuant to FRCP 56, Defendant Barrick Goldstrike Mines, Inc. (hereinafter referred to

18  as "Barrick"), submits this Motion for Summary Judgment.

19              **MEMORANDUM OF POINTS AND AUTHORITIES**

20  **I.      INTRODUCTION.**

21          On September 11, 2010, Lester Decker ("Decker") crashed a bus transporting nine (9)

22  Barrick employees, causing the hospitalization of multiple fellow co-workers who suffered,

23  among other things, concussive head injuries, a fractured nose, lacerations (some requiring

24  stitches), and acute contusions and strains.  Each injured worker lost multiple days of work due

25  to accident-related injuries; one worker missed fifty-five (55) days of work.   After an

26  investigation revealed that Decker was responsible for the accident, Barrick terminated Decker.

27  After an unsuccessful charge with the Equal Employment Opportunity Commission ("EEOC"),

28  Decker filed this action, alleging discrimination based on his age and Native American status.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

Decker has admitted, however, that he has no admissible evidence and/or reason to believe that his age or Native American status played any part in Barrick's termination decision.  For that and other reasons, Decker cannot meet the *prima facie* tests for age and race/color/national origin discrimination, nor raise a triable issue of fact regarding pretext.  Consequently, Barrick's Motion should be granted.

II.   **FACTUAL BACKGROUND.**[1]

   A.   **The Parties and Relevant Witnesses.**

Barrick is a subsidiary of Barrick Gold Corporation ("Barrick Gold"), and operates Barrick Gold's Goldstrike Mine, located close to Elko, Nevada.  *See* Declaration of Jared Pierce ("Pierce Decl."), at ¶ 2 (attached hereto as **Exhibit "1"**).   Randy Buffington ("Buffington") was the Goldstrike Mine's General Manager.  *Id.*  Steve Lindskog ("Lindskog") and Bruce Blackstock ("Blackstock") were crew supervisors at Barrick.  *See* Deposition of Steve Lindskog ("Lindskog Dep."), at 5:18-6:19 (relevant pages attached hereto as **Exhibit "2"**); Deposition of Bruce Blackstock ("Blackstock Dep."), at 4:13-21 (relevant pages attached hereto as **Exhibit "3"**).   Lindskog had supervised D crew (on which Decker worked) until shortly before the incident giving rise to this lawsuit, at which time he switched positions with Blackstock who had previously supervised C crew.  Lindskog Dep., at 5:25-6:19.  Lindskog is part-Native American.  Lindskog Dep., at 26:17-27:2.

Dale Tarbet ("Tarbet") was a General Supervisor, Mark Rantapaa ("Rantapaa") was a Mine Operations Superintendent, and Dan Banghart ("Banghart") was a Mine Division Manager at Barrick.  *See* Declaration of Dale Tarbet ("Tarbet Decl."), at ¶ 2 (attached hereto as **Exhibit "4"**); Declaration of Mark Rantapaa ("Rantapaa Decl."), at ¶ 2 (attached hereto as **Exhibit "5"**); Declaration of Dan Banghart ("Banghart Decl."), at ¶ 2 (attached hereto as **Exhibit "6"**).   Aileen Pajunen ("Pajunen") was a Human Resources Manager at Barrick, and Jared Pierce ("Pierce") was a Human Resources Representative reporting to Pajunen.  Pierce

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

---

[1]  To satisfy the summary judgment standard, Barrick will present only that facts that are either undisputed, or which Decker has no admissible evidence to contradict.  In so doing, Barrick does not waive its right to contest Decker's factual allegations in the future, should Decker survive summary judgment.

Decl., at ¶ 2; Declaration of Aileen Pajunen ("Pajunen Decl."), at ¶ 2 (attached hereto as **Exhibit "7"**).  Lou Schack ("Schack") was Barrick Gold's Director of Communications for North America.  *See* Deposition of Lou Schack ("Schack Dep."), at 5:20-6:18 (relevant pages attached hereto as **Exhibit "8"**).

Decker worked as an equipment operator at Barrick.  Decker claims to be Western Shoshone, and was previously affiliated with the Te-Moak Tribe until approximately 2004, when the tribe re-interpreted its Constitution and dis-enrolled Decker.  Deposition of Lester Decker ("Decker Dep."), at 107:24-109:13 (relevant pages attached hereto as **Exhibit "9"**).  Accordingly, Decker does not specifically affiliate with the Te-Moak Tribe, but more generally with the Western Shoshone culture.  Decker Dep., at 107:24-109:13.

**B.   Relevant Policies and Standards.**

1.   Barrick's Intolerance for Discrimination or Harassment.

Barrick is "committed to fair employment practices" and prohibits harassment and discrimination on the basis of, among other things, age, race, color, and national origin.  *See* Code of Conduct,[2] at ¶ 9 (relevant pages attached hereto as **Exhibit "10"**);[3] Harassment Policy attached hereto as **Exhibit "11."**[4]  Barrick "expects" employees to report prohibited conduct to management and has established a confidential Compliance Hotline (with a toll-free number), answered by an outside service provider and available to all employees.  *Id.; see also* Ex. 10, Appendix A.  Although Decker was aware of the Hotline, he never lodged a harassment or discrimination complaint prior to his termination.  Decker Dep., at 66:3-20; 128:6-129:8.

2.   Barrick's Safety Standards.

Barrick's Motto is: "Every person going home safe and healthy everyday."  *See* Safety and Health Policy attached hereto as **Exhibit "12"**;[5] Standards of Conduct Policy, at 3

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

---

[2] This document is authenticated in the declaration of Jared Pierce, at ¶ 4.

[3] Although the policies and standards of conduct referenced in this Motion come from Barrick Gold, Barrick has adopted these policies and standards, and they apply with full force and effect to every Barrick employee.  *See* Pierce Decl., at ¶ 4.

[4] This document is authenticated in the declaration of Jared Pierce, at ¶ 4.

[5] This document is authenticated in the declaration of Jared Pierce, at ¶ 5.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1  (attached hereto as **Exhibit "13"**).[6]  In an effort to improve safety, Barrick and its employees
2  developed a Courageous Leadership program, which is known all over the world and is
3  recognized in the State of Nevada as the best program for safety skills and training.  *See*
4  Deposition of Randy Buffington ("Buffington Dep."), at 37:4-20 (relevant pages attached
5  hereto as **Exhibit "14"**).  Barrick employees (including Decker) receive annual training on the
6  program and are taught that they have the power to challenge authority or stop production if
7  they see something that is unsafe.  *See* Buffington Dep., at 37:4-25; *see also*
8  http://barrickbeyondborders.com/2011/08/barrick-gold-safety-through-courageous-leadership/
9  (visited on June 11, 2013).

10         In addition, Barrick holds safety meetings with employees after every seven (7) days
11  that a crew has off and emphasizes safety in line-out meetings.  Decker Dep., at 132:8-133:16.
12  Many of Barrick's vehicles and machines are equipped with Inthinc, a monitoring system,
13  which provides in-cab mentoring, GPS, speed recording, braking, and other safety features.
14  Not surprisingly, Barrick has won multiple safety awards.  *See* Declaration of Kevin Hughes
15  ("Hughes Decl."), at ¶¶ 2-3 (attached hereto as **Exhibit "15"**); *see also*
16  http://www.nevadamining.org/nvmablog/2012/07/02/nevada-mining-association-honors-
17  industrys-top-safety-advocates-with-2012-safety-awards/ (visited on June 11, 2013).  Barrick
18  policy regarding buses transporting personnel requires drivers to inspect their vehicles and not
19  operate vehicles which are unsafe (including operating with obstructed vision) or drive faster
20  than conditions permit.  *See* Hot Change Bus Policy attached hereto as **Exhibit "16."**[7]

21         **C.     Decker's Training and Employment History.**

22         Decker became employed with Barrick in 1992.  Decker Dep., at 16:11-18:1.  Before
23  joining Barrick, Decker had worked at JR Simplot, another mine, since approximately 1976,
24  where he had operated passenger buses.  *See* Decker Dep., at 11:21-13:12.  He knew how to
25  operate a bus, including the fact that he had to check the bus's windows and make sure they
26
27  ───────────────
    [6] This document is authenticated in the declaration of Jared Pierce, at ¶ 5.
28  [7] This document is authenticated in the declaration of Jared Pierce, at ¶ 5.

4

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

were wiped.  *Id.*  According to Decker's personnel file, while at Barrick, Decker received training on how to operate a passenger bus in 1999 and 2006 (including checking windows and visibility).  *See* Training Information Sheet and MSHA Certificate of Training attached hereto as **Exhibit "17";**[8] October 15, 2006 Performance Checklist and Certificate of Training attached hereto as **Exhibit "18."**[9]  In June 2009, Decker completed training modules on the topics of defensive driving, risk factors, *impaired driving*, safety practices, and managing hazards.  *See* Training Certificates attached hereto as **Exhibit "19."**[10]

While Decker's performance over the years was generally good, he was involved in multiple safety incidents, which resulted in discipline.  In January 1994, Decker received an oral reminder regarding safety.  *See* March 2004 Written Reminder attached hereto as **Exhibit "20"** (reflecting the prior oral reminder).[11]  In October 1994, Decker's truck hit a parked truck while backing up to a dump because he did not see the parked truck.  *See* Records Related to October 1994 Incident attached hereto as **Exhibit "21."**[12]  Decker received a Decision-Making Leave Day, which is the most serious discipline short of termination.  *Id.; see also* Decker Dep., at 139:20-143:13, 146:18-20.[13]  In March 2004, Decker received a Written Reminder for failing to properly monitor the wear on parts of his equipment, which led to equipment damage.  *See* Ex. 20.  Decker received another Written Reminder in August 2007 for running over a shovel cable, which damaged the cable and shut the shovel down.  *See* August 2007 Written Reminder attached hereto as **Exhibit "22."**[14]  Although nobody was injured during the

---

[8] These documents are authenticated in the declaration of Jared Pierce, at ¶ 6.

[9] These documents are authenticated in the declaration of Jared Pierce, at ¶ 6.

[10] These documents are authenticated in the declaration of Jared Pierce, at ¶ 6.

[11] This document is authenticated in the declaration of Jared Pierce, at ¶ 7.

[12] These documents are authenticated in the declaration of Jared Pierce, at ¶ 7.

[13] At his deposition, Decker claimed that he supposedly accepted blame for the incident to protect another employee; he later stated that the incident was partially his fault because his father had died and his mind was wondering.  Decker Dep., at 139:20-143:13.  For purposes of this Motion, Decker's claim is immaterial because Decker was not terminated as a result of the incident, and there is no evidence that Decker advanced his new-found theory at any point before his deposition.

[14] This document is authenticated in Decker's deposition, at 164:2-21.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1   incident, Decker acknowledged that he could have caused deadly harm to himself and his co-

2   workers. *Id.; see also* Decker Dep., at 164:22-165:1.   Finally, while supervising Decker,

3   Lindskog had verbally counseled Decker at least five (5) times to clean his windshield because

4   the windshield was dirty.  Lindskog Dep., at 14:5-15:8.

5       **D.      Decker's Bus Accident.**

6       On the day of the accident, Decker's crew was scheduled to work at the bottom of an

7   open pit mining area.  There were at least two roads leading in and out of the area – the "Suzy"

8   ramp (a longer way) and the 12th West ramp.  Pierce Decl., at ¶ 8.  As the mine plan called for

9   a change on the 12th West, traffic was re-routed, and the area was prepared for a drill pattern.

10  *See* Investigative Report attached hereto as **Exhibit "23."**[15]   The road modification was not

11  unusual as open pit mine operations at Goldstrike involve "constant change," and roads and

12  ramps frequently disappear.  Buffington Dep., at 36:17-37:3.  Drilling commenced on or about

13  September 9, 2010 and, as the blasted material was pushed up, an approximately nine-foot (9)

14  dig face was created.  Ex. 23.  A berm was built on the 12th West ramp below the dig face,

15  which largely blocked off the road and allowed only a small opening for light vehicles.  *See*

16  Area Photos attached hereto as **Exhibit "24."**[16]   Cones were placed near the light vehicle

17  opening, and warning lights were placed on the berm to further warn drivers of the berm's

18  presence.  *Id.; see also* Hughes Decl., at ¶ 5; Ex. 27, at 3.  Past the berm, the 12th West ramp

19  veered to the left, instead of going straight into the drill pattern.  *Id.*

20      On September 10, 2010, Decker and his crew worked the night shift which began at

21  approximately 6:50 p.m. and was supposed to end at about 7:20 a.m. on September 11, 2010.

22  Decker Dep., at 176:23-177:2; Ex. 23.   In the pre-shift meeting before the shift started,

23  Blackstock advised the crew that a certain point of the 12th West had been blocked off for haul

24  traffic.  Decker Dep., at 177:19-178:8.[17]   When the pre-shift meeting ended, Decker's crew

25

26  [15] This document is authenticated in the declaration of Kevin Hughes, at ¶ 4.

27  [16] These photos are authenticated in the declaration of Kevin Hughes, at ¶ 5.

28  [17] Blackstock testified that he informed the crew that the road had been blocked off.  However, for purposes of this Motion, this difference between Decker's and Blackstock's testimony is immaterial.

6

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1   took the Suzy and went down into the pit.  Decker Dep., at 179:3-21.  Another employee who
2   could not locate his truck took the bus that Decker's crew initially used, and Decker called
3   dispatch to arrange for a new bus to come down.  Decker Dep. at 181:5-8.[18]

4         At approximately 5 a.m., Ronnie Sorenson ("Sorenson"), another Barrick employee,
5   drove the new bus to the bottom of the pit and returned to the on-site office.  At approximately
6   6:30 a.m., Kirk Jones ("Jones"), a dozer operator, started the bus to warm it up for the rest of
7   the group.  *See* Ex. 23.  Jones did not drive the bus and was not going to operate the bus at any
8   point in time.  *See* Deposition of Jared Pierce ("Pierce Dep."), at 38:10-16 (relevant pages
9   attached hereto as **Exhibit "25"**); *see also* Ex. 23; Decker Dep., at 182:16-18; 189:7-19.  At
10  approximately 6:34 a.m., Decker prepared to drive the bus and logged into the Inthinc system.
11  Ex. 23.  While Decker allegedly performed a walk-around inspection, he did not clean the bus
12  windshield, even though Windex and paper towels were available in the vehicle.  Decker Dep.,
13  at 182:22-183:10; 184:10-22; 194:18-21.  The windshield's "cleanliness" can be seen on the
14  attached  photographs.   *See*  Accident  Photographs  attached  hereto  as  **Exhibit  "26."**[19]
15  Nevertheless, Decker did not consider the windshield dirty.  Decker Dep., at 184:7-9.  He felt
16  that if Sorenson drove the bus down without cleaning the windshield, then it did not bother
17  him, and he could still see out the windshield.  Decker Dep., at 182:22-183:10.

18        Decker picked up his eight (8) other colleagues and began heading east on the 12th
19  West, even though it "would have been no problem" for him to have used the Suzy.  *See*
20  Decker's Appeal Statement attached hereto as **Exhibit "27."**[20]  After a right-hand turn, Decker
21  was blinded by the rising sun.  Decker Dep., at 189:13-23; Ex. 27, at 3.  Decker stated that
22  when he "headed north East, directly into the sun," he could not see and therefore asked the
23  passengers if anyone could see: "I asked if anybody could see the road.  One person sitting in

24

25  [18]  Although the Hot Change Bus policy provides that the on-coming crew is to provide a bus driver, the common
26  practice with respect to the particular location was different because the bottom of the pit was far down.  Decker
    Dep., at 181:9-22.  Accordingly, crews took their own bus down and parked it, so they could use in on the way
    out.

27  [19]  These photographs are authenticated in the declaration of Kevin Hughes, at ¶ 5.

28  [20]  This document is authenticated in the declaration of Jared Pierce, at ¶ 9.

7

the front said, 'No, Les, I can't see a thing.'" Ex. 27, at 3; *see also* Decker Dep., at 193:21-25. Despite being unable to see, Decker did not stop, did not call for assistance, did not clean the windshield and did not even use the bus's sun visor. *Id.*, at 4. Instead, Decker continued driving up the 12th West while watching the left side of the road, even though Barrick did not train him to do so. *Id.*, at 3; Decker Dep., at 13:23-15:8, 189:13-23. Decker eventually came to the barrier berm that stopped haul traffic, saw the traffic cones placed near the berm, and found the light vehicle opening. Ex. 27, at 3; Decker Dep., at 189:13-23. Decker drove through the opening, even though he "still couldn't see" and continued straight ahead because he thought his way out was "directly into the sunlight." Decker Dep., at 190:1-10. The road made a left hand turn a few hundred yards beyond the berm, but Decker failed to see the turn. *See* Ex. 24.

Operating blindly and assuming the road went straight ahead, Decker continued driving the bus through the drill pattern. *Id.*, at 3-4; *see also* Decker Dep., at 191:4-9; Ex. 26. Decker "couldn't see nothing," and eventually drove the bus directly into the dig face barrier. Decker Dep., at 191:21-22; Ex. 27, at 4. If Decker had not been blinded, he would not have driven over the rough drill pattern area nor hit the dig face. Decker Dep., at 196:11-15, 197:24-198:1. The impact caused Decker to be thrown forward with his hard hat hitting the windshield. This caused the windshield to crack and the base of the windshield to be pushed forward about 1/4 of an inch. *See* Ex. 23, 26. Seven of the eight passengers suffered injuries, including (1) laceration to lower lip, . . . inside mouth, [and] chin; stitches required; (2) acute chest contusions; acute cervical and thoracic strains; (3) concussive head injury; fractured nose (surgery required); lip contusions; cervical strain; (4) concussive head injury; nose and lip contusions; right shin abrasion; (5) concussion; right ankle sprain, abrasions and contusions; head pain; (6) concussive head injury; forehead hematoma; cervical and thoracic strain; and (7) concussive head injury; left face contusion; acute cervical and thoracic strain; right shoulder contusion. *See* Summary of Claims attached hereto as **Exhibit "28"**;[21] *see also* Third Party

---

[21] This document is authenticated in the declaration of Sandy Bell, at ¶ 3 (attached hereto as **Exhibit "29"**).

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

Administrator Records attached hereto as **Exhibit "30."**[22]  The injured employees were taken to the hospital; each lost multiple days of work due to their injuries, with one employee missing fifty (55) days of work.  *Id.*

### E.   Post-Accident Investigation.

As a result of the accident, Barrick conducted an investigation which spanned over several days.  *See* Ex. 23; *see also* Inthinc Records attached hereto as **Exhibit "31";**[23] Witness Statements attached hereto as **Exhibit "32."**[24]   According to the Inthinc report generated during the investigation, Decker registered speeds in excess of the twenty-five-mile (25) limit at the mine.  Decker Dep., at 196:16-20; Ex. 31.  As part of the investigation, Decker provided a statement in which he admitted that he continued to drive despite not being able to see.  Ex. 32, Statement of Lester Decker.  One of the bus passengers confirmed that Decker had been blinded by the sun, asked if anyone could see, and still continued to drive.  Ex. 32, Statement of Kirk Jones.

An employee working nearby indicated that (i) Decker was driving at approximately 25-30 mph, (ii) Decker did not hit the brakes until the bus hit uneven ground, (iii) Decker admitted he did not see the dig face because the sun was in his eyes, and (iv) "the sun was so bad, [Decker] barely missed the berm below.  *Id.*, Statement of Chris Snow.  The accident photographs further underscored the conclusion that Decker completely failed to see the turnoff on the left because the sun was in his eyes, and that window visibility was compromised by dust and streaks inside and outside the windshield.  Hughes Decl., at ¶ 5.  The damage done to the bus was extensive, and repair costs (along with the cost of towing to Salt Lake City) were approximately $23,000.00.  *See* Hughes Decl., at ¶ 8; Repair Invoices attached hereto as **Exhibit "33."**[25]

///

**HOLLAND & HART LLP**
**5441 KIETZKE LANE, SECOND FLOOR**
**RENO, NEVADA 89511**
**(775) 327-3000**

---

[22] This document is authenticated in the declaration of Sandy Bell, at ¶ 3.

[23] This document is authenticated in the declaration of Kevin Hughes, at ¶ 6.

[24] This document is authenticated in the declaration of Kevin Hughes, at ¶ 7.

[25] These documents are authenticated in the declaration of Kevin Hughes, at ¶ 8.

9

**F.   Recommendation for Termination and Decker's Appeal.**

After the investigation, Barrick decided that Decker should be discharged for his unsafe driving which caused the accident, injuring seven co-workers and damaging the bus itself.  *See* Recommendation for Termination attached hereto as **Exhibit "34."**[26]  The Barrick employees who had input into the termination decision were Lindskog, Blackstock, Tarbet, Rantapaa, Banghart, Pierce, and Pajunen.  *See* Barrick's Answer to Interrogatory No. 2 (relevant pages attached hereto as **Exhibit "35."**).  ***Decker has admitted that he has no admissible evidence and/or no reason to believe that any of the people who had input in the termination decision harbored ill will against him because he is Native American or based on his age***.  *See* Decker Dep., at 91-97, 101-106.

Decker challenged his termination pursuant to Barrick's appeal policy, which permits an appeal to a panel of his/her peers or directly to the General Manager.  *See* Appeal Policy, at 1-2 (attached hereto as **Exhibit "36"**).[27]   Decker chose the peer panel because he had supposedly heard Buffington was a Native Nevadan (from which Decker surmised he disliked Native Americans), and that Buffington allegedly did a lot of firing, though none of the firing was race-based.   Decker Dep., at 101:17-103:10; 213:6-10.[28]   Under the appeal policy guidelines, the peer panel could "recommend" a change in the decision to the General Manager, but only on the basis of "new evidence or information of a substantial nature not presented and not reasonably available at the time of the incident directly impacting the decision," or "wrong or misdirection of evidence, having a direct impact on the decision."  Ex. 36, at 2; *see also* Appeal Policy Guidelines attached hereto as **Exhibit "37."**[29].  Regardless of the peer panel's recommendation, under the appeal policy the General Manager makes the "final decision on the termination."  Ex. 36, at 2.

---

[26] This document is authenticated in the declaration of Jared Pierce, at ¶ 9.

[27] This document is authenticated in the declaration of Jared Pierce, at ¶ 9.

[28] As described in more detail below, Decker's assessment of Buffington was completely off-base because Buffington actually grew up with famous Native American rights activists and went out of his way to help Native Americans.

[29] This document is authenticated in Buffington's deposition, at 29:8-19.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

In his appeal, Decker claimed that he was not at fault for the accident, but admitted that he was informed of "changes" that had taken place, including that the 12th West had been closed to all haul truck traffic and was left open only to light vehicles. Ex. 27, at 2. Decker also conceded that he had continued to drive blindly, even after asking his co-workers if anyone could see and receiving a negative response. *Id.*, at 3. Decker further admitted that he had not cleaned the bus's windshield, though he tried to justify his failing in that regard by blaming the previous operator, and then denying that the windshield needed cleaning. *Id.* Decker also admitted that he could have easily taken the Suzy and did not explain why, after being blinded by the sun, he did not use the Suzy to get out of the pit. *Id.*

The appeal panel consisted of Decker's co-workers, all of whom Decker considered friends. *See* Appeal Panel Recommendation attached hereto as **Exhibit "38";**[30] Decker Dep., at 211:4-25. None of the passengers who were involved with the September 11, 2010 accident sat on the panel. Decker Dep., at 213:15-18. Not surprisingly, the panel recommended against Decker's termination. The panel's determination rested on their conclusions that (i) the existence of the dig face was not specifically mentioned at the pre-shift meeting and Decker was otherwise unfamiliar with the changes on the 12th West; (ii) there was no allegedly no signage to indicate potential hazards; (iii) Decker supposedly could not have safely cleaned the windshield because he needed a long-handled squeegee; and (iv) Decker did not feel it was safe to stop based on his prior experience. Ex. 38.

After considering the panel's recommendation, Buffington (in his role as General Manager of the Goldstrike Mine) determined that the panel did not present information that met the reversal standard. Buffington Dep., at 30:4-9; *see also* Buffington's Letter attached hereto as **Exhibit "39."**[31] At his deposition, Buffington explained that he did not find the panel's recommendation compelling because Decker had the opportunity to change the outcome of that accident by taking another route, stopping, or using available communications,

---

[30] This document is authenticated in the declaration of Jared Pierce, at ¶ 10.

[31] This document is authenticated in the declaration of Jared Pierce, at ¶ 10.

but he did not follow the proper process.  Buffington Dep., at 36:6-13.  Buffington further stated that Decker was highly trained in the process of dealing with change because an open pit is a constant change, and Decker had undergone years of safety training, during which he was advised that he could stop any job that was unsafe.  Buffington Dep., at 36:17-38:3.

Next, in his appeal, Decker had advanced (and the panel had accepted) the argument that Decker could not safely stop because he had been previously hit from behind while stopped at the JR Simplot mine and allegedly knew of other such incidents at JR Simplot.  Ex. 27, at 1.  However, Buffington noted that Decker's experience was at another mine (JR Simplot), while at Goldstrike there is a ramp and a road, and people stop on the ramp "all the time for emergency conditions."  Buffington Dep., at 38:8-39:6.  Buffington elaborated that people must be able to stop because one never knows when equipment could break down, and the way to handle the stop is by calling dispatch to inform all other vehicles in the area.  Buffington Dep., at 38:8-39:15.

Buffington was also not compelled by the panel's opinion regarding more warning signage because if Decker could not see five (5) feet away, more signs would not have helped.  Buffington Dep., at 36:11-16.  As to the long-handled squeegee, Buffington stated that Decker could have called for supplies, or could have taken the Suzy (without sun in his eyes), but he chose to proceed on the 12th West.  Buffington Dep., at 39:16-40:1.  According to Buffington (and also admitted by Decker), Decker could have easily turned around and taken the Suzy because the 12th West was big enough for a forty-feet (40) wide truck to make a U-turn in the middle of the road.  Buffington Dep., at 40:2-12.  Buffington's decision to uphold Decker's termination had nothing to do with Decker being a Native American or Decker's age.  Buffington Dep., at 30:13-21.[32]

---

[32] The panel also mistakenly believed there were no warning indicators besides traffic cones because there were blinking yellow alert lights on the barrier berm.  *See* Ex. 24, Hughes Decl., at ¶ 5.  The panel also overlooked the fact that there were Windex and paper towels in the bus that Decker could have used, and, despite the alleged need for a long-handled squeegee, Decker admitted he would have "got up there" and cleaned the windows if he thought they were dirty.  Decker could have also used the windshield wipers.  Further, Decker could have used the Windex and paper towels to wipe the inside of the windshield and at least partially alleviate the visibility problem.  Decker did not, however, consider the windshield to be dirty.  Decker Dep., at 183:23-184:9.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

G.   <u>Tribal Litigation Against Barrick Cortez</u>

Decker claims that he was terminated because his wife Jody Abe ("Abe") was on the Te-Moak tribal council, which approved the commencement of land rights litigation against Barrick Cortez (the "Cortez Litigation"), another mine owned by Barrick Gold.  *See* Am. Compl., at ¶ 12.  Barrick denies Decker's claims, but will discuss the issue as Decker will likely raise it.

The Cortez Litigation concerned a proposed expansion of the Cortez Mine to areas purportedly sacred to the Western Shoshone, including the Te-Moak tribe.[33]  Abe served as a Te-Moak councilmember during multiple terms, but her last term on the council was between 2004 and 2006.  Deposition of Jody Abe ("Abe Dep."), at 18:10-19:9 (relevant pages attached hereto as **Exhibit "47"**).  In 2006, the council issued a resolution opposing the Cortez Mine's expansion.  *See* Resolution No. 06-TM-02 attached hereto as **Exhibit "40."**[34]  There was no Barrick representative at the meeting where the resolution was reached, and Barrick had no way of knowing who voted in favor of the resolution because council voting did not identify the manner in which council members voted; just that there was a majority.  Abe Dep., at 41:5-42:23.  After Abe stepped down from the council in 2006, she had no further involvement with the council and no decision-making authority.  Abe Dep., at 39:6-13.

The Cortez Litigation was commenced on November 20, 2008 by the South Fork Band Council of Western Shoshone of Nevada, Timbisha Shoshone Tribe, Western Shoshone Defense Project, and Great Basin Resource Watch (collectively, the "Cortez Plaintiffs").  *See South Fork Band Council of Western Shoshone of Nevada et. al. v. United States Department of Interior et. al*, Case No. 3:08-cv-00616-LRH-WGC (United States District Court for the District of Nevada), Doc. #3.  The named defendants in the litigation were the United States Department of Interior, the United States Bureau of Land Management, and Gerald Smith.  *Id.*  On November 24, 2008, Barrick Cortez, Inc. sought to intervene in the action.  *Id.*, Doc. #7.

---

[33] The Court is, undoubtedly, well-familiar with the underlying facts because the Cortez Litigation was before the Court.

[34] This document was authenticated in Abe's deposition, at 46:10-13.

1  On December 18, 2008, the Cortez Plaintiffs filed an amended complaint, adding the Te-Moak

2  tribe as an additional plaintiff.  *Id.*, Doc. #40.  At that time, Decker was still dis-enrolled from

3  the tribe, and Decker's wife had been off the tribal council for over two (2) years.  Abe Dep., at

4  18:10-19:9; 22:17-23:15; 28:2-8.  Barrick hired Decker's son, Dusty Decker (who is the same

5  race, color, and national origin as Decker), in September 2010 - shortly before Decker's

6  termination.  Decker Dep., at 176:7-12; Abe Dep., at 60:8-19.  Dusty Decker is still employed

7  with Barrick and reportedly "loves it."  Abe Dep., at 60:8-19; *see also* Decker Dep., at 176:7-

8  12; Pierce Decl., at ¶ 11.

9  **III.    ARGUMENT.**

10        **A.    Motion for Summary Judgment Standard.**

11        The "[s]ummary judgment procedure is properly regarded not as a disfavored

12  procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

13  designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex*

14  *Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. Proc. 1).  Granting summary

15  judgment is appropriate where, even after drawing inferences in the light most favorable to the

16  non-moving party, all reasonable inferences defeat the non-moving party's claims as a matter

17  of law.  *See Securities Exchange Comm'n v. Seaboard Corp.,* 677 F.2d 1297, 1298 (9th Cir.

18  1982).  The party seeking to defeat summary judgment cannot simply stand on its pleadings

19  and must show, through admissible evidence, that a genuine issue of material fact exists.  *See*

20  Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)

21  (only admissible evidence can be considered on summary judgment); *Anheuser-Busch, Inc. v.*

22  *Natural Beverage Distributors*, 69 F.3d 337, 345 n.4 (9th Cir. 1995) (same).

23        **B.    Decker's Age Discrimination Claim Should Be Dismissed.**

24        The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq.,

25  prohibits discrimination based on an employee's age (40 or over).  *Id.* at §§ 623(a), 631(a).  To

26  establish an ADEA violation, a plaintiff "must first establish a prima facie case of

27  discrimination."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000).  The

28  *prima facie* case may be based either on a presumption raised through factors such as the ones

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1  recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), or shown

2  through more direct evidence of discrimination. *Wallis v. J.R. Simplot, Co.*, 26 F.3d 885, 889

3  (9th Cir. 1986).  If the plaintiff meets the *prima facie* test, the burden then shifts to the

4  employer to "articulate a legitimate nondiscriminatory reason for its employment decision."

5  *See Coleman*, 232 F.3d at 1281.  "Once the employer meets this burden, the presumption of

6  discrimination drops away."  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th

7  Cir. 1996).  Then, in order to prevail, the plaintiff must demonstrate that the employer's

8  articulated reason "for the adverse employment decision is a pretext for another motive which

9  is discriminatory." *Coleman*, 232 F.3d at 1281 (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885,

10  889 (9th Cir. 1994)).  The burden of proof remains always on the employee.  *Id.*

11            1.    <u>Admissions by Decker Warranting Summary Judgment.</u>

12         Decker believes that his termination constituted age discrimination because he was

13  supposedly getting ready to retire and would have been due a severance package from Barrick.

14  Decker Dep., at 254:2-6.  However, ***Decker admits that he has no reason to believe that***

15  ***Blackstock, Lindskog, Pierce, Pajunen, Rantapaa, Tarbet, or Banghart harbored ill will***

16  ***against him based on his age.***  Decker Dep., at 105:22-106:21.  As to Buffington, Decker

17  claims Buffington harbored age bias against Decker because "I'm sure he knew I was ready to

18  retire." Decker Dep., at 105:22-107:10.  However, Decker never told Buffington he wanted to

19  retire, Decker does not know why he thinks Buffington knew he was going to retire, and

20  Buffington never made negative comments based on Decker's age.  Decker Dep., at 105:22-

21  107:22.  These admissions alone warrant summary judgment.

22            2.    <u>Decker Cannot Meet the *Prima Facie* Case.</u>

23         A *prima facie* case of discrimination requires a showing that the plaintiff was (1) a

24  member of the protected class (at least age 40); (2) performing his job satisfactorily; (3)

25  discharged; and (4) replaced by a substantially younger employee with equal or inferior

26  qualifications.[35]  *See Coleman*, 232 F.3d at 1281; *Nidds*, 113 F.3d at 917.  Decker fails to

27

28  [35] While a plaintiff may establish a *prima facie* case through direct evidence of discriminatory intent, *see Wallis*, 26 F.3d at 889, Decker has no such evidence.  At his deposition, Decker testified that he thought "probably" every Barrick supervisor had called him an "old man," but had no facts to support his claim.  *See* Decker Dep., at 77:5-

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

15

1   establish at least that he was performing his job satisfactorily at the time of his termination.

2   The question of whether a plaintiff was performing according to her employer's

3   legitimate expectations generally requires an analysis of her performance as a whole.  *See*

4   *Coburn v. PN II, Inc.*, 372 Fed.Appx. 796, 798 (9th Cir. 2010); *Maduka v. Columbia/HCA*

5   *Healthcare Corp.*, 234 Fed.Appx. 708, 710 (9th Cir. 2007).  Even a single failure to follow

6   established policy can demonstrate that the plaintiff was not meeting the employer's legitimate

7   expectations at the time of termination.  *See Guerrero v. Beverly Hills Hotel*, No. CV 92-5503,

8   1994 WL 383228, 5 (C.D.Cal. 1994) (plaintiff who was terminated for fighting with another

9   employee did not meet expectations where a handbook provision stated that fighting may result

10  in termination); *see also Toussaint v. Sheriff of Cook County*, 2000 WL 656642, 5 (N.D.Ill.

11  2000) (despite employee's fifteen-year tenure, he no longer met employer's legitimate

12  expectations when he violated drug policy).   "It is the employer's perception of job

13  performance, and not the employee's perception, that is controlling."  *Mahomes v. Potter,* 590

14  F.Supp.2d 775, 782-83 (D.S.C. 2008).

15  Here, Decker consciously violated multiple Barrick safety policies because the Hot

16  Change Bus Policy mandates, among other things, that (i) buses not be operated if they are

17  unsafe, (ii) drivers not operate any bus with obstructed vision. Ex. 16; *see also* Ex. 13, at 3

18  (instructing employees to be always conscious of the safety rules and potential hazards, and

19  prohibiting safety violations that endanger life or limb).   Decker knew that Barrick policy

20  required drivers not to drive with obstructed vision and testified that was also common sense.

21  Decker Dep., at 174:16-23.   Decker also knew that if a vehicle became unsafe during

22  operation, "you should just stop, park it, take it to the shop.  You do not want to put anybody's

23  lives in danger."  Decker Dep., at 175:2-18.  Yet, Decker continued operating the bus blindly,

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

24

25  11. Even if he had, however, such stray remarks cannot sustain his claim.  *Nesbit v. Pepsico, Inc*., 994 F.2d 703, 705 (9th Cir. 1993) (a comment by plaintiff's supervisor that "[w]e don't necessarily like gray hair" uttered in an

26  ambivalent manner and not tied directly to plaintiff's termination was, at best, weak circumstantial evidence of discriminatory animus toward plaintiff); *Hodczak v. Latrobe Specialty Steel Company*, 2011 WL 5592881, *2 (3rd

27  Cir. 2011) (comments corporate executives and managers made regarding retirement and wanting "new blood" and a "younger workforce" were stray remarks entitled to minimal weight.").   More importantly, as indicated

28  above, Decker has no admissible evidence that the people who had input into his termination decision harbored any ill will against him based on his age.

even after asking his co-workers if anyone else could see and receiving a negative response, and despite acknowledging he could have easily pulled over.  Ex. 27, at 3-4; *see also* Decker Dep., at 193:21-25; 202:12-204:1-5.  Decker's actions caused serious injuries to various co-workers, and resulted in property damage in excess of $20,000.00.  *See* Ex. 28, 30, 33.  No reasonable jury could find Decker was meeting expectations based on his admitted policy violations and the resulting consequences.  *Breitman v. May Co. California*, 37 F.3d 562, 565 (9th Cir. 1994) (granting summary judgment in employer's favor was appropriate where employee failed to establish a prima facie case element).

### 3.    Decker Cannot Show Pretext.

Decker was terminated because of his conscious choice to continue driving under unsafe conditions.   Ex. 34; Pierce Dep., at 13:11-14:3; Buffington Dep., at 36:6-38:3.  Accordingly, to survive summary judgment, Decker has to show that Barrick's reason for his termination was pretextual.  *Coleman*, 232 F.3d at 1281.  A plaintiff can prove pretext in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  *See Chuang v. University of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).   Direct evidence proves discriminatory animus without inference or presumption.  *Boddett v. Coxcom*, 366 F.3d 736, 743 (9th Cir. 2004).  Where the plaintiff relies on circumstantial evidence of pretext, that evidence must be both specific and substantial.  *See Coleman,* 232 F.3d at 1282.  "To satisfy that burden, and survive summary judgment," a plaintiff "must produce enough evidence to allow a reasonable fact finder to conclude either*:* (a) that the alleged reason for [the plaintiff's] discharge was false, *or* (b) that the true reason for his discharge was a discriminatory one."  *Nidds,* 113 F.3d at 918 (emphasis in original).  An employee cannot simply show that "the employer's decision was wrong, mistaken, or unwise;" courts only require that an employer honestly believed its reason for its actions, even if the reason foolish or even baseless.  *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir. 2002).  A plaintiff cannot show pretext where, at most, the employer had a good faith mistaken belief.

17

*See Swenson v. Potter*, 271 F.3d 1184, 1196 (9th Cir. 2001) ("[T]he employer will insulate itself from . . . liability if it acts reasonably.").

### *The Appeal Panel Determination*

Decker will likely rely on the appeal panel's determination termination as evidence of pretext. However, Decker has already admitted that he has no reason to believe that Blackstock, Lindskog, Pierce, Pajunen, Rantapaa, Tarbet, or Banghart harbored ill will against him based on his age, which eliminates any possible showing of pretext. Decker Dep., at 105:22-106:21. This is not surprising as all of these individuals, except for Pierce, were over forty (40) at the time of Decker's termination. Pierce Decl., at ¶ 12; Pajunen Decl., at ¶ 2; Rantapaa Decl., at ¶ 2; Tarbet Decl., at ¶ 2; and Banghart Decl., at ¶ 2. Even if the panel disagreed with the decision to terminate Decker's employment, Decker cannot link such a disagreement to age animus against Decker. Buffington – the ultimate decision-maker – was fifty-one years old at the time of Decker's termination (i.e., only 6 years younger than Decker), did not know how old Decker was, and did not consider Decker's age while making the decision to affirm his termination. Buffington Dep., at 15:13-21. Decker has no admissible evidence of age bias on Buffington's part nor evidence that Buffington (whom Decker had met once in a group meeting) knew Decker wanted to retire. Decker Dep., at 107:11-22.

Further, the appeal panel consisted of Decker's "friends," and none of the passengers whom Decker injured participated in the panel. Ex. 38, Decker Dep., at 211:4-25; 213:15-18. That Decker's friends did not wish to see him terminated does not create pretext. Moreover, the panel's conclusions did not meet the standard for reversal of Decker's termination and were otherwise unsound. Buffington Dep., at 30:4-9; *see also* Ex. 39. Whether or not the dig face was specifically mentioned in the pre-shift meeting is of no moment when changes to the area were indisputably announced, and an open pit mine is "constant change." Ex. 27; Buffington Dep., at 36:17-37:3. More importantly, the panel ignored the fact that Decker had the opportunity to change the outcome of that accident by taking another route, stopping, or using available communications when the sun blinded him. Buffington Dep., at 36:6-13. Instead, he chose to continue driving blindly. Decker concedes that if he were able to see, he would not

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

have driven over the drill pattern nor hit the dig face.  Decker Dep., at 196:11-15; 197:24-198:1.  The panel also misapprehended the alleged lack and significance of signage because there were blinking lights on top of the lower berm, and even if there had been more signage, Decker would not have noticed them anyway because he could not see.  Ex. 24; Hughes Decl., at ¶ 5; Buffington Dep., at 36:11-16.

With respect to the alleged need for a long-handled squeegee, the panel overlooked the fact that Decker could have called for supplies, or could have taken the Suzy (without sun in his eyes), but he chose to proceed on the 12th West.  Buffington Dep., at 39:16-40:1.  And, despite the supposed need for a long-handled squeegee, Decker admitted he would have "got up there" and cleaned the windows if he thought they were dirty.  Decker could have also used the windshield wipers.  Decker Dep., at 182:22-184:6.  Further, Decker could have used the Windex and paper towels to wipe the inside of the windshield and at least partially alleviate the visibility problem.  In reality, Decker simply did not consider the windshield dirty, Decker Dep., at 183:23-184:9, so the panel's decision on that point was nothing but an after-the-fact attempt to justify Decker's actions.

Finally, the conclusion that Decker supposedly could not stop is belied by Decker's admissions that he could recall no incidents *at Barrick* where someone who had stopped was hit from behind, he did not see any vehicles coming behind him on the 12th West, and he could have announced on the radio's general line that he was stopping, or called dispatch.  Decker Dep., at 194:25-196:10; 203:8-13.  Additionally, the 12th West was wide enough for two haul trucks (which are about twenty-two (22) feet wide vs. a twelve-feet (12) wide bus) to pass on it comfortably, and Decker "had a lot of area to pull over," even if a haul truck was behind him.  Decker Dep., at 202:12-204:1-5.  Accordingly, the panel's decision cannot establish pretext.

### *Supposed Comparators Treated Differently*

Decker will also likely try to establish pretext through the claim that similarly situated younger employees were treated more favorably.  To advance such a claim, Decker has to offer admissible evidence that the alleged comparators were similarly situated in all material respects.  *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010).

1    "Individuals are similarly situated when they have similar jobs and display similar conduct."

2    *Id.*   Where the type and severity of an offense are dissimilar, employees are not similarly

3    situated.   *Id.; see also Vasquez v. County of Los Angeles,* 349 F.3d 634, 641-42 (9th Cir. 2003)

4    (employees who were not involved in the same type of offense and were not of the same

5    stature were not similarly situated).   At his deposition, Decker gave a number of "comparator"

6    examples, which will be discussed below.   *However, Decker has failed to produce any*

7    *evidence that any other Barrick employee was involved in a motor vehicle accident causing*

8    *injuries to so many people, let alone one involving a conscious decision to continue operating*

9    *unsafely like Decker did.*   Thus, there are no proper comparators.   The EEOC (which is

10   notoriously employee-friendly) reached the same conclusion.   *See* January 18, 2012 Notes

11   from the EEOC Investigator attached hereto as **Exhibit "41."**[36]

12                              *Ronnie Sorenson and Kirk Jones*

13           Barrick anticipates that Decker will point to the fact that Sorenson (the employee who

14   brought Decker's hot change bus down to the pit at about 5 a.m.) and Jones (the employee who

15   started the bus around 6:30 a.m. to warm it up for the rest of the crew) similarly did not clean

16   the bus windshield, but were not terminated.   This does not show pretext for several reasons.

17   As to Sorenson, Barrick decided against imposing discipline because Sorenson did not drive

18   the bus at the same time of the day, and the driving conditions were different (i.e., no sun

19   glare).   Further, Barrick was unable to determine how much dust was present on the windshield

20   when Sorenson operated it because dust could have accumulated while the bus was waiting for

21   the crew.   Pierce Dep., at 20:23-21:18.   In an active mining area such as the pit where Decker

22   worked, a substantial amount of dust can accumulate in an hour.   Pierce Decl., at ¶ 8.   More

23   importantly, no accident occurred and no employees were injured while Sorenson drove the

24   bus down.   On prior occasions when Decker himself had not cleaned the windshield, but no

25   accidents resulted, he was only given oral counseling by Lindskog to clean his windshield.

26   Lindskog Dep., at 14:5-15:8.

27

28   _____
     [36] These documents were received pursuant to a FOIA request to the EEOC and are therefore, public records.

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

As to Jones, he only started the bus and did not drive it at any point in time.  Pierce Dep., at 38:10-16; Ex. 23; Decker Dep., at 182:16-18; 189:7-19.  The Hot Change Bus Policy mandates that "drivers" will not operate with obstructed vision, "drivers" will clean windshields if vision is obstructed, and "drivers" will stop if vision becomes obstructed during operation.  Ex. 16.  Decker himself admits that a pre-shift inspection (including checking window visibility) is required "if you're going to drive a bus. . . [I]f you aren't, you don't need to do it.  It's just usually the person operating the bus."  Decker Dep., at 151:6-16; 185:4-7.  Moreover, Jones did not cause an accident or injuries to co-workers like Decker did.  Most importantly, *Decker admits that he had an obligation to clean the bus windows even if others failed in their duties and was not excused from compliance because other employees were allegedly not following policy.*  Decker Dep., at 187:22-188:1.

*Decker's Other Alleged "Comparators"*

Decker first points to an incident involving a haul truck operator who drove with his truck bed in the air and hit overhead power lines, which required an evacuation of an underground mine ("Example 1").[37]  Decker Dep., at 223:10-224:16.  Although the incident resulted from driver inattention, Barrick also determined that the dump body indicator and propel lights had been disabled by mechanics who were similarly inattentive.  The driver and the mechanics were disciplined, even if they were not ultimately terminated.  *See* ███s Written Reminder and Mechanics Discipline Records attached hereto as **Exhibit "42."**[38]  Decker admitted the driver was on a different crew, under different supervisors, and nobody was injured.  Decker Dep., at 224:19-225:6.  There is also absolutely no evidence that the driver made a conscious choice to operate unsafely like Decker did.  Accordingly, he is not a proper comparator.

Decker next contends that █████████, another driver, ran over a shovel cable and received a Decision-Making Leave Day, and upon his return from leave, he ran another shovel

---

[37] Decker points to the same incidents in support of his race/national origin/color discrimination claim.

[38] These documents are authenticated in the declaration of Jared Pierce, at ¶ 13.

21

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

cable ("Example 2").  Decker Dep., at 226:15-20.  However, Decker committed a similar offense in August 2007 and received only a written reminder, which is a less severe punishment than ███████ s Decision-Making Leave Day.  *See* Ex. 22; Decker Dep., at 227:19-228:4.  Although Decker claims that the incident was potentially deadly because there were people on the ground when ██████ ran over the shovel cable, Decker has no evidence that any injuries resulted from the incident.  Decker Dep., at 227:8-11.  Decker also neglects his own August 2007 incident, during which he admitted he could have caused deadly harm to himself and his co-workers, but was not terminated.  Ex. 22; Decker Dep., at 164:22-165:1.  The employee is not a proper comparator because Decker has failed to show conscious choice on his part to continue operating under unsafe conditions (as opposed to simply being negligent), or resulting injuries to multiple co-workers.

Decker next points to an incident on a hot change bus during which an employee allegedly bounced so high that he cut his head open, but the driver is still supposedly employed with Barrick ("Example 3").  Decker Dep., at 228:8-13.  Decker did not personally witness the cause of the incident because he was in the back of the bus.  He claims that the driver hit a hole on the road, but has no idea what caused the driver to get in the hole, or whether the driver saw the hole, but kept driving anyway.  Decker Dep., at 228:14-229:11.  Only one employee got hurt on the bus, and Decker does not know the driver's age.  Decker Dep., at 229:20-231:13.  This incident is not comparable to Decker's because Decker has no admissible evidence that the driver was substantially younger than Decker, or made a conscious decision to operate unsafely.  The gravity of the offense was also less than Decker's because only one person was injured (as opposed to seven).

Decker's next example involves a smashed van incident, in which one employee was supposedly injured ("Example 4").  Decker was not in the bus and "assumes" the driver was fault and not paying attention for some reason, but does not know that for a fact.  Decker also does not know the driver's age.  Decker Dep., at 230:6-231:24; 233:9-19.  The driver in this incident is not a proper comparator because Decker has no admissible evidence that the driver was at fault, that the fault (if any) amounted to a conscious choice on the driver's part, or that

22

the driver was substantially younger than Decker.  The information that someone was injured is also hearsay, at best, and even then, is no case of the same magnitude as the accident Decker caused.

Decker further points to an incident involving ████████ a haul truck driver, in which a fatality occurred when ██████ supposedly failed to stop at a stop sign, and a pickup ran under the truck ("Example 5").  Decker did not personally witness the incident and heard about it from co-workers.  Decker Dep., at 233:7-234:23.  He concedes that at least one of the co-workers was not on the scene when the accident occurred.  Decker Dep., at 234:14-23.  As to the other co-worker, Decker stated that the co-worker supposedly determined ████ failed to stop by looking in his rearview mirror, and "it might be deceiving too.  Maybe ████ did stop. . . . [W]ho knows.  There's so many things that could have happened."  Decker Dep., at 236:12-237:19.  In sum, Decker offers only inadmissible hearsay and speculation, which cannot sustain his claims.  *See* Fed. R. Evid. 701, 801, 802; *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 385 (9th Cir. 2010) (district court's ruling on summary judgment may only be based on admissible evidence).

Decker's next example is an alleged roaster incident where an employee suffered burns ("Example "6).  Decker heard about it through Neil Sholey, a co-worker, who also did not personally witness the incident, but supposedly concluded that there had not been a proper transition from one crew to another.  Decker did not know how Sholey acquired the information about the incident and speculated Sholey must have spoken to supervisors.  Decker Dep., at 239:13-244:6.  This incident does not indicate pretext because it did not involve a motor vehicle accident causing injuries to multiple co-workers, and Decker has no admissible evidence that anyone was at fault, let alone that the fault was conscious choice.  Decker also offers no admissible evidence that the alleged comparators were substantially younger than him.[39]

---

[39] Decker seems to insinuate the supervisors were at fault for the incident.  Supervisors are not generally considered "similarly situated" to non-supervisors. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 641-42 (9th Cir. 2003)

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

23

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1    Two other examples Decker gives are an employee getting within the swing radius of a
2 shovel, but not being terminated ("Example 7") and deaths occurring at the Meikle
3 underground mine ("Example 8").  However, Decker did not witness the shovel incident,
4 Decker Dep., at 246:13-247:19, and has not presented admissible evidence of the level of fault
5 that caused the incident, the operator's age, or any resulting injuries.  As to the Meikle
6 incident, Decker heard about it from people working there and a coroner who had read about it
7 in the newspaper.  Decker Dep., at 248:3-249:5.  Decker has no understanding of exactly what
8 occurred, does not know whether the foreman had given an improper instruction, and has no
9 idea of what discipline was imposed to the people who were determined to be at fault.  Decker
10 Dep., at 249:2-13.  In addition, the incident did not involve a motor vehicle, and Decker has no
11 admissible evidence of the alleged comparator's age.

12    Finally, Decker has speculated that "probably" "every shovel operator" has dropped a
13 rock in a truck bed, causing neck or back injuries to the truck driver (Example "9").  Decker
14 Dep., at 249:19-250:11.  However, Decker cannot give any specific examples, does not know
15 the respective operator's ages, and is unaware of any shovel operator who injured multiple
16 people.  Decker Dep., at 251:6-16-252:3.  The alleged incidents are also dissimilar because
17 there is no admissible evidence that the unspecified shovel operators acted consciously.  In
18 sum, Decker has no admissible evidence that similarly situated comparators who were
19 substantially younger than Decker were treated differently, and Barrick's Motion should be
20 granted.[40]

21    **C.    Decker's Race Discrimination Claim Fails as a Matter of Law**

22    Although Decker's claim is styled as race, color, and national origin discrimination, it
23 was clarified at Decker's deposition that these claims are one and the same, and the protected

[40] Decker also contends that an MSHA representative and three Barrick supervisory employees told him after the accident that he would still have his job.  Decker Dep., at 202:3-8; 205:15-21.  However, Decker admitted that MSHA did not have authority to tell Barrick to keep someone employed.  Decker Dep., at 202:3-8.  As to the supervisors, Decker stated that these conversations allegedly occurred on September 12, 2010.  Decker Dep., at 206:11-207:9.  Even if the conversations did occur, there is nothing strange about them because Decker was not terminated until September 17, 2010.  Ex. 34.  Notably, right after the accident, Decker himself thought he would be terminated.  Decker Dep., at 199:1-10.

24

1    class is "Native American."  Decker Dep., at 80:5-82:22.  Barrick will analyze the claims

2    accordingly.

3              1.       Decker's Claim Fails Based on His Own Admissions.

4              *Decker has admitted that he has no admissible evidence and/or no reason to believe*

5    *that any of the people who had input into the termination decision harbored ill will against*

6    *him because he is Native American*.  *See* Decker Dep., at 91-97, 101-106.  In fact, Decker

7    thinks Tarbet harbored good will towards Decker because Decker was Native American, and

8    Tarbet respects Native Americans.  Decker Dep., at 72:16-21, 95:12-18.  Decker and Tarbet

9    "got along fairly well."  Decker Dep., at 94:24-95:5.  Decker also "got along fairly good" with

10   Lindskog, who is part Native American as well.  Decker Dep., at 90:18-91:12; Lindskog Dep.,

11   at 26:17-27:2.  While Decker thinks Buffington harbors ill will towards Native Americans

12   because Buffington is a Native Nevadan and supposedly fired a lot of people, *see* Decker Dep.,

13   at 101:17-103:10, 213:6-10, Buffington himself has never said or did anything to make Decker

14   think that Buffington disliked Native Americans, and the alleged firing was not race-based.  *Id;*

15   *see also* Decker Dep., at 100:20-101:6, 102:13-16.  Based on Decker's own admissions and

16   lack of admissible evidence of race bias by Buffington, summary judgment should be granted.

17   *Beyene,* 854 F.2d at 1181-82 (only admissible evidence can be considered on summary

18   judgment); *In re Oracle Corp. Securities Litigation,* 627 F.3d at 385 (same).

19             2.       Decker Cannot Meet the *Prima Facie* Case Test.

20             Similar to the age discrimination analysis above, a prima facie case of intentional

21   discrimination based on race "may be based either on a presumption arising from the factors

22   such as those set forth in *McDonnell Douglas Corp. v. Green* . . . or by more direct evidence of

23   discriminatory intent."  *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994).  To sustain

24   a race discrimination claim through the *McDonnell Douglas* framework,[41] Decker must show

25

26   [41] Decker has no direct evidence of discriminatory motive as to any of the people who had input into the
termination decision, except for his allegation that, at unspecified times, Lindskog made jokes about Native
27   Americans.  Lindskog, who is part Native American, denied the allegations, which are at best stray remarks.
More importantly, Decker has presented no admissible evidence that Lindskog's supposed attitudes towards his
28   own kind somehow affected the decision-making process.  Further, despite the claimed jokes, Decker did not
think that Lindskog harbored ill will against Decker because Decker is Native American, and he and Lindskog

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

that (1) he is a member of a protected class; (2) he was performing according to Barrick's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably, or his termination occurred under circumstances giving rise to an inference of race discrimination. *Vasquez,* 349 F.3d at 640; *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (using same test regarding allegations of race, color, and national origin discrimination).

As discussed on pp. 16-17 and 18-24 above, Decker fails to demonstrate the second and fourth elements. As an addition to the comparator issue, while the two employees referenced below are not true comparators because they did not cause injuries to as many people as Decker did, Barrick has previously terminated Caucasians for consciously disregarding safety rules. *See* Documents Related to ████████ attached hereto as **Exhibit "43"**;[42] Recommendation for Termination for ██████ attached hereto as **Exhibit "44."**[43] ████ ██████ a Caucasian, was driving a hot change bus when his windshield fogged over, reducing visibility. Nonetheless, he continued to drive with an impaired vision and ran into a rubber tired dozer. No one was injured in the incident. Although ██████ blamed the bus defroster for not working properly, ██████ was forced to resign (as is standard Barrick policy to allow that option) because he continued to operate the bus without full visibility. *Id.*; *see also* Pierce Decl., at ¶ 9. ██████ also Caucasian, was terminated for making a "conscious decision" to enter an inactive mine area, despite noticing a barricade and a closed ventilation bag, which led to the hospitalization of ████ and another employee. Ex. 44. As such, Decker cannot raise a genuine issue of fact that non-Native American comparators were treated better than Decker, and his claim fails.

///

"got along fairly good" and talked about personal things. *See* Decker Dep., at 90:18-91:19 (including: "Q: Do you think Steve Lindskog harbors ill will towards you based on the fact that you're Native American?  A: No.").

[42] These documents are authenticated in the declaration of Jared Pierce, at ¶ 9.

[43] This document is authenticated in the declaration of Jared Pierce, at ¶ 14.

26

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

3.      Decker Cannot Show Pretext.

Barrick's non-discriminatory reason for terminating Decker's employment have been articulated above, and Barrick will not repeat it.  Before turning to the pretext arguments Decker advances, Barrick will provide some perspective.

Barrick maintained Decker's employment for eighteen (18) years, knowing he is Native American.  If Barrick wanted to terminate Decker based on his Native American status, it had plenty of opportunity to do so, especially where Decker's performance history was not flawless.  Barrick treated Decker fairly, as evidenced by a March 1994 incident for which Decker was found not to be at fault, and correspondingly, was not disciplined.  *See* Incident Review Form attached hereto as **Exhibit "45."**[44]  Over the years, Blackstock had given Decker at least one (1) good performance review;[45] Lindskog had given Decker at least two (2) good performance reviews.  *See* 2005 Review by Blackstock, and 2007 and 2009 Reviews by Lindskog attached hereto as **Exhibit "46."**[46]  It is inane to conclude that Barrick management liked Decker enough to maintain his employment for eighteen (18) years and give him good performance reviews, but then suddenly started discriminating against him after he crashed a bus causing multiple injuries.

Next, in addition to Lindskog and Tarbet being part-Native American, Pajunen is a Metis.  Pajunen Decl., at ¶ 2.  Pierce grew up with Native Americans, and has family members who are Native American.  Pierce Decl., at ¶ 3.  Buffington – the ultimate decision-maker in this case - grew up on a ranch located near property owned by Carrie and Mary Dann (the "Dann Sisters"), Western Shoshone elders, spiritual leaders, and land rights activists.  Buffington Dep., at 27:11-27.  The Dann Sisters were long-time friends of Buffington's family, and he frequently rode and gathered with them as a child.  Buffington Dep., at 27:11-27.  In his prior roles, Buffington had implemented employment programs for Native Americans and helped a Native American tribe with securing their land expansion and related paperwork.

[44] This document is authenticated in the declaration of Jared Pierce, at ¶ 7.

[45] It appears that Blackstock supervised Decker's crew in or about 2005.

[46] These documents are authenticated in the declaration of Jared Pierce, at ¶ 6.

27

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

1   Buffington Dep., at 31:7-35:4.  In light of all this, to conclude that these Barrick employees

2   made any adverse decisions about Decker because he is Native American simply defies reason.

3          Decker's further "evidence" of pretext similarly makes no sense.  Because most of

4   Decker's pretext arguments have been addressed in the age discrimination section above,

5   Barrick will only focus on the pretext arguments specific to Decker's race/national origin/color

6   claim.  As to that claim, Decker speculates that Barrick discriminated against him because it

7   allegedly knew that his wife was a "vocal proponent" of the Cortez Litigation.  Decker also

8   asserts that Barrick stopped making contributions to the Te-Moak Tribe scholarship fund and

9   to tribal community initiatives.  *See* Am. Compl., at ¶ 12 (Doc. #5).  Decker has absolutely no

10  admissible evidence to support his speculations.

11         To begin, the Cortez Litigation involves a different Barrick Gold mine and had nothing

12  to do with Barrick – Decker's employer.  Abe's last term on the tribal council expired in 2006,

13  and she had no further involvement with the council or any decision-making authority after

14  that point. Abe Dep., at 18:10-19:9; 39:6-13.  Notably, Decker has no admissible evidence that

15  Barrick even knew of his wife's alleged support for the litigation because there was no Barrick

16  representative at the 2006 council meeting where resolution to oppose the Cortez Mine

17  expansion was reached.  Barrick also had no way of knowing who voted in favor of the

18  resolution because council voting did not identify the manner in which council members voted;

19  just that there was a majority.  Abe Dep., at 41:5-42:23; *see also* Decker Dep., at 161:1-5

20  (never saw Barrick representatives at tribal meetings).

21         Decker's wife used the last name "Abe" at all relevant times, and Decker admitted that

22  he had no admissible evidence and/or reason to believe that any but two of the people who

23  provided input in the termination decision even knew his wife.  Decker Dep., at 86:17-90:3,

24  95:19-100:25.  As to the two who allegedly knew Decker's wife (Steve Lindskog and Dale

25  Tarbet), Decker admits that he "got along fairly well" with both of them, did not think

26  Lindskog (part Native American) harbored ill will towards Native Americans, and Tarbet (also

27  part-Native American) respects Native Americans and asked Abe to do bead work for him.

28  Decker Dep., at 90-91, 94-95.  Decker has offered no admissible evidence that either Lindskog

or Tarbet knew Abe voted in favor of the Cortez Litigation five years before his termination, or that such knowledge had any impact on the termination decision.  With respect to Buffington, neither Decker nor his wife have any reason to believe Buffington knew Abe was Decker's wife.  *See* Decker Dep., at 100:20-25; Abe Dep., at 15:11-18.  Decker also had no reason to believe Buffington even knew with which tribe Decker associated (let alone that it was a tribe opposing the Cortez Mine expansion), and different tribes reside around Elko.  Decker Dep., at 104:20-105:2.

Decker's argument also makes no sense from a timing perspective.  Decker was not terminated until September 2010 – five years after Abe's involvement with the tribal council ended.  Even if Decker had a retaliation claim (which he does not), the extended period of time between Abe's disengagement from the council and Decker's termination belies Decker's causation argument.  Even if one considers the November 2008 commencement of the Cortez Litigation to be the relevant date, that is still almost two (2) years before Decker's termination, and Barrick Cortez voluntarily sought to join the litigation *before* the Te-Moak Tribe even became a plaintiff in the action.  *See South Fork Band Council of Western Shoshone of Nevada et. al. v. United States Department of Interior et. al*, Case No. 3:08-cv-00616-LRH-WGC (United States District Court for the District of Nevada), Doc. #3, #7, #40.

In other words, Decker's argument is that Barrick terminated him because a tribe from which he was dis-enrolled years ago decided to join a litigation against another mine, and waited almost two years after the litigation started (and five years after his wife supposedly supported it) to do so.  This makes no sense, especially where Barrick hired Decker's son, Dusty Decker (who is the same race, color, and national origin as Decker), in September 2010 - shortly before Decker's termination.  Decker Dep., at 176:7-12; Abe Dep., at 60:8-19.  Dusty Decker is still employed with Barrick and reportedly "loves it."  Abe Dep., at 60:8-19; *see also* Decker Dep., at 176:7-12; Pierce Decl., at ¶ 11.

Decker speculates the Cortez Litigation had something to do with Decker's termination because Schack, Barrick Gold's Director of Communications for North America, knew Abe was on the tribal council through his involvement with tribal dialogues.  Decker Dep., at 111:8-

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

112:5; 168:3-170:3.  Decker believes that Schack was involved with his termination based on Schack's position, a statement Schack made in the local paper about the September 2010 incident, and a supposed comment by Schack that he refused to sponsor a Native American basketball team because of the Cortez Litigation.  Decker Dep., at 166:15-170:3.  However, Decker admitted that if Schack testified he had nothing to do with Decker's termination, Decker would have no facts to rebut such a testimony.  Decker Dep., at 171:5-8.  Schack testified that he was not consulted in any way regarding Decker's termination and did not even know Decker was the employee involved in the September 2010 incident.  *See* Ex. 8, at 9:24-10:7.  Buffington similarly testified that Schack had no involvement in Decker's termination.  Buffington Dep., at 26:3-15.

As to Schack's statement to the media, Schack was at a mining convention at Lake Tahoe when the accident occurred, and only received second-hand information sufficient to make a statement about it.  Schack Dep., at 7:15-8:11.  Finally, Schack's alleged statement that he refused to sponsor a basketball team is of no moment because Schack was not involved in Decker's termination.   Accordingly, Decker has no admissible evidence to show that his termination for crashing a bus, injuring seven (7) co-workers, and causing over $20,000.00 in bus repair costs was pretextual, and summary judgment should be granted in Barrick's favor.

## IV.   **CONCLUSION.**

Based on the foregoing, Barrick respectfully requests that its Motion for Summary Judgment be granted, and Decker's case be dismissed with prejudice.

DATED this 17th day of June, 2013.　　　　/s/ Dora V. Lane, Esq.
　　　　　　　　　　　　　　　　　　　　Dora V. Lane, Esq.
　　　　　　　　　　　　　　　　　　　　Nevada State Bar No. 8424
　　　　　　　　　　　　　　　　　　　　dlane@hollandhart.com
　　　　　　　　　　　　　　　　　　　　HOLLAND & HART LLP
　　　　　　　　　　　　　　　　　　　　5441 Kietzke Lane, Second Floor
　　　　　　　　　　　　　　　　　　　　Reno, Nevada  89511
　　　　　　　　　　　　　　　　　　　　Telephone: (775) 327-3000
　　　　　　　　　　　　　　　　　　　　Facsimile:  (775) 786-6179

　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendant*
　　　　　　　　　　　　　　　　　　　　*Barrick Goldstrike Mines, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I hereby certify that on the 17th day of June, 2013, I served a true and correct copy of the foregoing **Defendant's Motion for Summary Judgment** by electronic transmission to the parties on electronic file and listed below:

Jeffrey A. Dickerson, Esq.                    Julie Cavanaugh-Bill, Esq.
9585 Prototype Court, Ste. A                  Cavanaugh-Bill Law Offices, LLC
Reno, Nevada 89521                            Henderson Bank Building
                                              401 Railroad Street, Ste. 307
                                              Elko, Nevada  89801

Dated: June 17, 2013.

                                              /s/ Marcia Filipas
                                              Marcia Filipas

6229238_2

HOLLAND & HART LLP
5441 KIETZKE LANE, SECOND FLOOR
RENO, NEVADA 89511
(775) 327-3000

31

## EXHIBIT INDEX

| NUMBER | DESCRIPTION |
|---|---|
| Exhibit "1" | Jared Pierce Declaration |
| Exhibit "2" | Relevant deposition transcript pages of Steve Lindskog |
| Exhibit "3" | Relevant deposition transcript pages of Bruce Blackstock |
| Exhibit "4" | Dale Tarbet Declaration |
| Exhibit "5" | Mark Tantapaa Declaration |
| Exhibit "6" | Dan Banghart Declaration |
| Exhibit "7" | Aileen Pajunen Declaration |
| Exhibit "8" | Relevant deposition transcript pages of Lou Schack |
| Exhibit "9" | Relevant deposition transcript pages of Lester Decker |
| Exhibit "10" | Barrick's Code of Conduct Policy |
| Exhibit "11" | Barrick's Harassment Policy |
| Exhibit "12" | Barrick's Safety and Health Policy |
| Exhibit "13" | Barrick's Standards of Conduct Policy |
| Exhibit "14" | Relevant deposition transcript pages of Randy Buffington |
| Exhibit "15" | Kevin Hughes Declaration |

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

| Exhibit "16" | Barrick's Hot Change Bus Policy |
|---|---|
| Exhibit "17" | Decker's 1999 Training Certificate and MSHA Certificate of Training |
| Exhibit "18" | October 15, 2066 Performance Checklist and Certificate of Training |
| Exhibit "19" | June 2009 Training Certificates |
| Exhibit "20" | March 2001 Written Reminder |
| Exhibit "21" | October 1994 Accident Records |
| Exhibit "22" | August 2007 Written Reminder |
| Exhibit "23" | Investigative Report |
| Exhibit "24" | Area Photos (berm, blinking lights) |
| Exhibit "25" | Relevant deposition transcript pages of Jared Pierce |
| Exhibit "26" | Accident photographs |
| Exhibit "27" | Decker's Appeal Statement |
| Exhibit "28" | List of Injured Employees |
| Exhibit "29" | Sandra Bell Declaration |
| Exhibit "30" | Gallagher-Basset Records |
| Exhibit "31" | Inthinc Records |

HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

| Exhibit "32" | Witness Statements |
|---|---|
| Exhibit "33" | Repair Invoices |
| Exhibit "34" | Recommendation for Termination |
| Exhibit "35" | Barrick's Interrogatory Responses (Relevant Pages) |
| Exhibit "36" | Barrick's Appeal Policy |
| Exhibit "37" | Barrick's Appeal Policy Guidelines |
| Exhibit "38" | Appeal Panel Recommendation |
| Exhibit "39" | Buffington's Appeal Denial Letter |
| Exhibit "40" | 2006 Resolution No. 06-TM-02 |
| Exhibit "41" | January 18, 2012 EEOC Notes |
| Exhibit "42" | Bart Moody and Mechanics' write-ups |
| Exhibit "43" | Mark Smith Discipline Records |
| Exhibit "44" | Rex Goff Recommendation for Termination |
| Exhibit "45" | Records of March 1994 incident |
| Exhibit "46" | 2005 Review by Bruce Blackstock and 2007 and 2009 Reviews by Steve Lindskog |
| Exhibit "47" | Relevant deposition transcript pages of Jody Abe |